Good morning, Judge Wilkin, Judge Owens, and Judge Scanlon. Because this argument, I believe, is so factually intensive, I'd like to try to reserve four or five minutes for rebuttal. We have three claims for bad faith. We are asking the Court to reverse summary judgment on the first one and let us have a trial on that, to reinstate the verdicts on Claims 2 and 3 without a new trial on those on Discovery and the Punitive Damages 2. The predominant issue that runs through the defendant's arguments or the appellee's arguments here and below is that we somehow interfered with their investigation of the claim by not signing a medical record release authorization. That has no impact on any one of the claims. Because if a release authorization was signed, what would it have accomplished? Ms. Gustafson, the claim adjuster, interviewed Christy Larson on August 9th, and Christy Larson told her, I have no prior pre-existing low back issues. So even if a release authorization was given for that, that would have never turned up anything on that. And when she did get counsel, why she didn't give it was on September 15th. They sent someone to her to sign this release authorization, and she said, now that you've denied the claim, I am not signing anything until I meet with my lawyer. That's what my lawyer asked me to do. She met with her lawyer that day, and release authorizations were provided. They were? It has no significance. Release authorizations were provided at that time? My understanding was that the initial authorization that was presented was in blank, essentially give me all your records of everything you've ever had in your entire life type authorization, and she declined that one. And then that later there was some sort of accommodation that was reached by the ALJ at the IC. Are there other authorizations that were signed, and what records were available? Yes, Judge Wilkin. There was release authorizations for all the records related to this claim, even prior to the accommodation with the ALJ. Those were sent over. Where is that in the record? How can we back that up? It's certainly in the summary judgment proceedings in the briefs on that. Mr. Sarkisoff mailed those over on October the 20th, I believe, mailed him release authorizations. But those were for the places that she received treatment, High Desert Clinic and Sierra Vista Regional Medical Center. And those records were all already in possession of Ms. Gustafson by September 9, because under Arizona law, a release authorization is not required to get records related to a claim. And that is documented in Exhibit 102, I believe it's page two of that, that she had all the medical records from Sierra Vista, August 1 and August 12, and High Desert of August 5. She had all of those already. And when she went to an IME in September, that same day she went to an emergency room because she had to drive down to Tucson to get an IME and then drive back to Phoenix, and her back was bothering her. So she was seen at another hospital because her back was bothering her. Those records were provided in December when everyone learned about those. The records that they fought over at the Industrial Commission aren't even really medical records. They're claims. They come from the Insurance Services Organization. Whenever someone has any kind of claim, you can now basically push a button and get a printout history of every claim related to this person or anyone at the address where they live or with a similar type of name or the same Social Security number. And those records simply didn't, five of them weren't even for this Christy Larson. And the others dated back to 1995, 2000, 2007, and 2008 and 2005. And did the adjuster have those records, those index records? She had 2007 and 2008 because those were workers' compensation claims. And by law, a carrier is allowed immediate access to all prior workers' compensation claims. None of them had anything to do with the low back. One of the facts that keeps getting looked over in this case is when Ms. Larson was injured, she was newlywed. And after eight years working for this same company, she was finally realizing her dream of some increase in the company, of going up into management. And all she wanted to do is get medical treatment and go back to work. And this fair debate ability that the first claim was thrown out on, the trial judge pointed out, well, she questioned the mechanism of the injury. And I think what gets lost is the holding in zillage that fair debate ability isn't the end of the inquiry that puts out bad practices and bad motives. Because what we see in that first claim is they came up with four different reasons, inconsistent defenses. So these weren't really, I think, fair beliefs. These were just avoidance strategies by Ms. Gustafson. The first one she said was, well, stepping down off a chair can't hurt your back. That was refuted by their own IME who said this injury can happen that way and she needs treatment and she can't work. The second one they came up with right after the IME came back, they said, well, there's some discussion about a truck, unloading a truck. But they never did anything to investigate that unloading of the truck. Well, and my impression was that any statements about unloading the truck were combined with statements about painting. Was there any document that said the injury was caused by loading a truck that didn't also mention the incident with the painting? They asked the IME doctor to investigate that, and she explained that the unloading of the truck was being done at the same time that she was painting. And she didn't unload the truck. She had her cook unloading the truck. Right, so there is no document, I believe, or tell me if there is, that says I was injured unloading a truck, period. Well, there is one medical record where she's describing all the things that were going on that day and she said we'd been working hard for two weeks, I'd been painting for days, I unloaded a truck, and I hurt myself. Okay, but the painting is always in there is what I'm trying to get at, is it not? The painting is always in there, yes, Your Honor. Thank you. I'd like to go to this second claim of holding up, because on December 29, when they admit they have no basis to go on denying this, they issue a notice of claim status accepting the claim, but she checks Box 3, which says no time from work missed in excess of seven days. Now, what kind of work goes into making that determination? Because she had the medical records of August 1 saying you're off for five days. She had the records from High Desert on August 5 saying no work until you get treatment for this from an orthopod. And then an IME in September says this is a work-related injury and she can't work. They fulfilled the seven-day threshold. So the fact that they're saying never any entitlement to disability benefits is just plainly false. And one of the things that continues throughout this claim is the plain notes that they are obligated to put their thought processes into and say why are we denying all these things are continuously blank on any issues like that. They just say what they're doing. Was the disability payment, if she were an injured worker and off work because of her injury that she sustained at work, if that were true, would the disability payments also be due in 21 days from notification unless the claim were denied by that time? Yes, they are due. That's under the statute 23-1062. It's either A or B. Payments are due within 21 days and every 14 days thereafter until you're back to a working status. And that goes for medical as well as disability. Medical is due promptly upon notice. And they had all that. The third claim. So the disability delay wasn't really just 59 days from December to February. It was however many days from mid-August to February. That's correct, Your Honor. That's correct. And that's why there should have been a greater sense of urgency with that because what the workers' compensation system represents is a tradeoff of tort rights and full compensation for expedited benefits. And that's under Supreme Court case law in Arizona, but it's also EGAN, a California case that has been cited in Arizona, that the good faith due is determined by the purpose of the insurance. The final claim was the failure to do anything about her need for more medical care. Because she wanted to go back to work, she went to Medicaid and got medical treatment on her own. She got two out of three injections into her spine and felt so good three days before Christmas, she said, Doctor, please release me back to work. I want to go back to work. And that's what happened. And so she went back to work and she cooperated. They knew about her release back to work the very next day because the claim file is replete with communications by the claim adjuster with the company. Are you taking her back to work? When is she coming back to work? They said we're putting her on December 30th. And she went back to work and then she quit in Sierra Vista. Now, mind you, she had to move back to Phoenix when she was homeless. I don't mean to jump in, but you did want to reserve time for rebuttal and you are cutting into that. Okay, I will reserve what time I have. Thank you. Good morning, Your Honors. Deanna Ayers representing Hartford. If I could jump right into the authorization issue. What the appellant in this case is requesting the court to do is set a new standard in Arizona, that being that the worker has no obligation to cooperate with the carrier when it's investigating a claim. And it's more, in this instance, than just the failure to provide an authorization. There was, from the very beginning of this claim, fair questions about compensability. That was due to the fact that the employer questioned the claim, the employer complained a late reporting issue, the employer provided information that at the time of the loss that the worker was on OxyContin for a pre-existing long-standing chronic back problem. Where does it say that? That's referenced in the briefs, but I couldn't find anything. I know he said she took somebody else's prescription, OxyContin, and I know he said she might have had a prior, but I'm not seeing any connection between those two in the record. It is in the claim notes. I'm sorry? It is in the claim notes, and it was also in Ms. Gustafson's testimony at the trial. Can you give me a cite? I cannot talk in my head. I apologize, but those are the two places. After argument, if you could file a 28-J letter with those record citations, that would be helpful. Yes, Your Honor. I will be glad to do that. So there was a question from the employer the very same day that the adjuster got the claim. I'm sorry, Your Honor. Right. But you started saying that you were going to tell us what she did wrong. Right. My understanding is she declined to sign, or at least some evidence would indicate that she declined to sign, a blank authorization at a certain point. Is there anything beyond that? Yes, Your Honor, there is. The day on August 9th, the day that the adjuster spoke with Ms. Larson for the first time, she had contacted already the Sierra Vista location where she sought care and asked for their records. They said this didn't come in as a work-related claim. We can't release the records to you. So the adjuster called Ms. Larson, this is in the record, and asked, I'm going to be sending you an authorization. I need the authorization signed. I need to get those records, and I need a list of the doctors that you've seen relative to back care. Ms. Larson declined to sign that initial request for those records. And was that a blank authorization? That one was with regard, well, yes and no. It was designed to allow the adjuster to receive records that were on the attached sheet. So it was a two-step process. The worker was supposed to list the medical care she had received, and then that authorization would blanket allow the adjuster to get the care on the attached sheet. That was a two-page document. Later, I think what the Court's referring to, there was an index that came back that showed positive on 13 occasions for someone with Ms. Larson's name, date of birth, social security number, and place of residence. And the adjuster was able to get those things without, the adjuster was able to get those things? No, the adjuster could not get those things. How did they get them? And that was when the blanket authorization went to Ms. Larson so that the index search. And that was never returned. So they got the list but not the underlying documents? They got the list not from Ms. Larson but from the Bureau of Index. And from the Bureau of Index, the adjuster then sent a blanket authorization to the worker to sign so that she could get records from those 13 sites. And that would include requesting it from the insurance carriers that reported it and requesting it from any health care providers that she had seen relative to those reported claims. It never came back and that was never provided. The limited authorizations that were provided that counsel referenced in argument pertain to in October, Mr. Sokowitz sent to Mr. Baker a limited release that allowed the carrier only to get records from September 19th up until the day of the authorization and only from Sierra Vista and Desert Plains. And only for the date of loss that was being asserted by Ms. Larson, which was the July 28, 2010. So those were the only authorizations that were given to Hartford was just for those limited records. Hartford had the prior workers' comp claims. No. No. I think they did. And this is why. And this came out in the evidence through Mr. Baker at trial. Once Mr. Baker came in, he was able to request ICA turnover prior claims that ICA had. However, if there's no hearing and there's no evidence taken, then there is limited material filed with ICA. In other words, every doctor doesn't file every single report, every objective test, every piece of evidence with ICA regarding the treatment that they're given. And so what Mr. Baker testified in the record he was able to obtain was basically the reports of injury that had come in on those claims that were with ICA and if there was a doctor that was providing treatment. And there were a couple of pages of medical where doctors reported that they had seen her and given her care and the body part that was being treated. But that was it. And so Mr. Baker then sent authorizations to Mr. Sarkowitz and said, we need to get these records and this is what we want. And he sent numerous authorizations to these healthcare providers that showed up in the ICA records. But as Mr. Baker testified, he could only get what ICA had. And if a provider in a prior claim hadn't actually had a need to file something with ICA, it simply wasn't there. So the only way to get it would be to go to the provider and ask for it, but you can't get it from the provider on another claim unless you have an authorization. And so Hartford. These were prior claims for lower back injuries that they were seeking? Well, you couldn't tell during the course of the trial, Ms. Larson did concede that some of the records reflected that there were at least one to two prior back claims. Not lower back, however. That was in dispute at trial. There were some records that indicated lower. There were some that indicated thoracic. I believe Ms. Larson testified at one point back, but then she came back and said upper back. But the bottom line was the carrier shouldn't have to just take a worker's word for it. The carrier should be able to get records and look at them and determine whether or not this is something that would contribute to the claim, be the cause of the claim, or be the claim. And Hartford simply wasn't allowed that. And the cooperation is more than just not providing a release. At the very beginning of the claim, appellant's attorney wrote the adjuster and said you are not allowed to contact my client, that's fine, but you're also not allowed to have any contact with the health care providers. And so what this did, in fact, was it precluded the adjuster from having contact with the doctors that were treating her for this claim to ask questions like, are you treating her? Has she been in? What's your diagnosis? What's your prognosis? Have you referred her? Are you giving her objective tests? Essentially, what happened on this claim was the appellant and her attorney controlled what documents they chose the carrier to have. They controlled the access. They picked and chose what the IME doctor was able to see and what the carrier was able to see. And there was no authority to support that that's the appropriate conduct in Arizona. In fact, the law recognizes there's a duty to cooperate. Could you talk a little bit about the statutory scheme that seems to say that a carrier, a workers' comp carrier at least, must pay the claim, at least temporarily, if they are unable in good faith to deny it within 21 days? Could you talk about the purpose behind that statute and how it was addressed here? Well, I can. And basically there's nothing that requires payment during an investigation under the Arizona scheme. The provision in issue is revised civil statute 23-1061M. And that provision only states that if you fail to dispute the claim within 21 days of receipt of the ICA notification, then you are liable for the claim. Well, you're liable to pay it until you are able to deny it, if you ultimately deny it. You're not on the hook for the claim forever, right? The statute says you have to deny it within 21 days, or you accept that claim. Until it's denied. That's not what the statute says, Your Honor. Would you read it to me? I don't have the statute at the desk. But I will tell the Court there is absolutely not one reported case or unreported case under Arizona that limits the carrier to conducting its investigation within 21 days or that would require the carrier to pay during the pendency of the investigation as long as the denial is filed under subsection M. Under subsection M, once you file the notification that you're disputing the claim, then you are relieved from any obligation to pay unless there's further action that's taken. So unless there's a further notice or an award out of ICA. And that simply didn't happen here. In this instance, there was no way for the adjuster to make happen what needed to happen within the time period. She wanted the IME. You have to give 15 days' notice of an IME. She wanted to get the records. She was never given the authorization or the ability to get the records. In fact, under the standard that exists, there had to be a showing that Hartford intentionally denied the claim without a reasonable basis and that it knew it was doing so. In this case, the evidence reflected Hartford never thought this claim was payable, never believed that it was, and paid when it finally got some records in December after it had had to file a motion to compel with the ICA and after its attorney was able to look at some of the records that we're paying a lot of money to continue to defend this claim, we're going to just accept the claim, and we're going to move on. That's what Ms. Gustafson testified happened in this matter. I'm looking at M, which M as in mother. M, yes, Your Honor. Which seems to say that they have to pay until the date upon which the carrier issues a notice of claim denying such claim. What I'm getting at is that in your brief you talk a lot about, oh, we had to investigate, and it wouldn't be fair to make us pay without investigating. And it seems to me that the scheme would allow you to investigate after you paid, and that if you investigated and found the claim was no good, you could at that point, when you developed enough information to deny the claim, you could then deny it and stop paying. That's how I read this. Maybe I'm wrong. There's no law, there's no case. If there was, I would have been in the briefing. There's no law that's interpreted that way, and certainly whatever you pay, there's no scheme in Arizona where you can recoup money that's paid. I'm not suggesting that. I'm suggesting you could go on and investigate, and if your investigation showed grounds for denial, you could then stop paying. There's not anything under the scheme or any decision that would support that, Your Honor. And I would say also if I could, looking at what would be paid on this claim, there was a big dispute in the records with regard to what existed. And what was in the carrier's possession was a 5-day-off work slip from Sierra Vista, which didn't say it was work-related, but there was 5 days off. Disability doesn't accrue until the 7 days. And then you had records that said that she could continue to work. You heard counsel talk about the Desert Plains record. When was there records saying she could continue to work? In December, December 29. Well, before that, the John Lincoln released her, and then there was an August 5 Sierra that also released her. That was a discussion not only of McCoy's testimony, but also of Ms. Gustafson's testimony. And there was a Desert Plain record that the appellant relies on that said she couldn't work until she saw an orthopedic doctor. But what the evidence also established at trial was that that document wasn't provided to the carrier until much later in the claim. Counsel, I want to follow up on Judge Wilkins' question. I'm looking at subsection M of the statute. Yes, Your Honor. And I guess I don't quite understand your analysis of it. The carrier shall pay immediately compensation as if the claim were accepted from the date the carrier is notified until the date upon which the carrier issues a notice of claim status denying such claim. You seem to be interpreting another level of interpretation there. Help me out with that. Well, basically, Your Honor, the provision and the authority that interprets subsection M reflects that should the carrier never file a denial, whether it was a compensable claim or not, that they have lost the right to contest it and that they have accepted that however, if the carrier does file the dispute within the 21-day time period, it was filed a little bit earlier in this case, within the 21-day time period, then they're entitled to stand on the dispute until something else happens. They investigate it. They can file another notice of claim status, or there could be an ICA determination that benefits were due. However, if I can say something, there had to have been, before there was any duty to pay anything, there had to have been something come to the adjuster within the time period before the dispute that would have prompted payment. And prior to the dispute, which was actually made in this case on September 7, 2010, there were no records provided to the adjuster to establish more than seven days of disability, because that would have been the trigger prior to the denial, was that she would have had to have known seven days of disability prior to the Is it clear that there was a denial of the claim within 21 days? Yes, Your Honor. The denial of the claim, the notification from ICA which triggers it, was dated August 26, 2010. Okay. And the notice of claim status of denial was September 7, 2010. Okay. Thank you. Yes, Your Honor. So if I could just state in my few seconds here. You're actually over, so why don't you wrap it up. My apologies, Your Honor. It's that Hartford believes that there's no evidence in the record and requests that the rulings of the trial court be affirmed in all things. Thank you, counsel. Thank you. Rebuttal. Is there a particular question you'd like to? There is, counsel. I think Judge Wilkin asked opposing counsel a number of questions about Arizona law and what Arizona law requires in this context. And opposing counsel said there's nothing in the statute or in the case law that would require the insurance company to automatically pay in a certain situation. Can you address opposing counsel's contention that there's nothing in the statute or nothing in the case law that would require what Judge Wilkin was suggesting could be there? I think the statute speaks for itself, as well as the purpose of the workers' compensation law. Grammatico is a Supreme Court case that says the purpose is a tradeoff of rights to get expedited benefits. But there is no case law interpreting this statute yet in Arizona because the only way we're going to get this statute interpreted is in the context of a bad faith case because the industrial commission has limited jurisdiction. And this, I think, has been happening too frequently of late, that they just deny because they want more time. And so you're now automatically in a litigated situation. That denial becomes res judicata if you don't go to hearing. Now, once an ALJ goes to hearing, he says, well, this is a compensable claim. So what's the remedy at that point? Their only remedy is to grant benefits. The only way we get this statute interpreted is through a bad faith case. Well, what it says is that even if they pay because they weren't able to deny quickly enough, they are still able to continue their investigation and stop paying if they develop the information that the claim should be denied. That's exactly right. And it seems like that's what the statute says, and counsel seemed to indicate that it didn't really say that or something. And I just... And what supports that interpretation is the doctrine of imperi materia that we went through in the trial court, that when you look at the next to it statutes that says prompt medical care, disability benefits within 21 days of notification, that's a term of art. That's the August 26th date that the industrial commission mails it to them. They have this claim August 2nd. They interviewed and denied it in the claim notes August 9th, the very first day. They said we're going to deny this without any investigation. What I'd like to get to is that I believe the manager did accuse Christy Larson of preexisting conditions and having taken OxyContin at some point. But that was never investigated, and it's just not true. And this is a woman who worked eight years for Prior Denny's Franchises. Ten months she was coming to work hard, trying to make a promotion in this company without any problems. And all of a sudden now we've got a preexisting condition. They could have interviewed co-employees to find out, is there some preexisting, a limp, back problem. Actually, that raises another question I had. Even if there were a preexisting condition, does not workers' comp law in Arizona provide for payment if a preexisting condition is exacerbated by a work-related injury? And they completely ignore that law. That's Mandex v. Industrial Commission. Riley, there's a lot of cases. It only takes two things, three things really, to have a compensable aggravation. That is something that requires medical care that you didn't receive before, that wasn't necessary before, or increased disability, your ability to keep working has been impacted, or an organic change. Now, an organic change would only show on MRI, and that didn't occur until she went to access. But she's been working there for ten months without problems, and now all of a sudden she's got multiple doctors documenting she can't work, she needs medical care. All right, thank you very much, counsel, for your argument. The argument in this case is now submitted. Or this case is to submit, I should say.
judges: O'scannlain, Owens, Wilken